## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

EYEPARTNER, INC.,
a Florida Corporation,

          CASE No. _____

       Plaintiff,

v.

          **<u>JURY TRIAL REQUESTED</u>**

KOR MEDIA GROUP LLC d/b/a GLOVUE
a Nevada Limited Liability Company, and
ROBERT KORMAN, an individual,

       Defendants
_____/

## <u>COMPLAINT FOR COPYRIGHT INFRINGEMENT, TRADE SECRET THEFT, CONVERSION, AND UNFAIR COMPETITION</u>

Plaintiff EYEPARTNER, INC. ("EPI" or "Plaintiff"), through its undersigned counsel, hereby sues Defendants KOR MEDIA GROUP, LLC ("KMG") and ROBERT KORMAN ("Korman") (both KMG and Korman collectively "Defendants").

### THE PARTIES, JURISDICTION IN FLORIDA, AND VENUE

1.      This is a civil action pursuant to the Copyright Act, 17 U.S.C. §§ 101 *et. seq.*, the Digital Millennium Copyright Act, including 17 U.S.C. § 1201 and § 1202, Florida Statute Ch. 688, the common law of the State of Florida, and related claims for injunctive relief, damages in excess of $75,000.00 exclusive of interest, attorney fees and costs.

2.      EPI is a Florida corporation headquartered at 5409 Overseas Highway, Suite 219, Marathon, Florida 33050.  EPI is a software development firm with offices in the United States and Europe with a focus on creating proprietary software for broadcasting and streaming high-definition ("HD") video content over the Internet.  EPI offers a variety of HD broadcasting solutions, including its TikiLIVE platform (hereinafter "TikiLIVE") which operates through the

Internet Protocol Television ("IPTV") system to allow live streaming content over packet-switched networks.

3.      Upon information and belief, KMG is a Nevada limited liability company having its place of business at 3150 West Wingwam Ave., Las Vegas, Nevada 89139.   Upon further information and belief, KMG was incorporated on July 20, 2011 and is owned by Korman. Upon further information and belief, KMG has done business since approximately September 2011 under the name GloVue as well as operated an internet domain name www.GLOVUE.com (the "GloVue Website") for purposes of selling and offering for sale software solutions for the broadcasting and streaming of HD video content through the IPTV system.      Nic Mitchell ("Mitchell"), upon additional information and belief, is KMG's Chief Technology Office and the administrator of the GloVue Website.

4.      Upon information and belief, Korman is an individual having offices and working in Las Vegas, Nevada.   Upon information and belief, Korman is the sole owner and manager of KMG and represents the moving force with regard to KMG's actions and conduct.   In addition to his role at KMG, Korman is also an investor in various oil and mining speculators including Bain Production, LP and Arc Heights Facility LLC.

5.      This District has *in personam* jurisdiction as to both Defendants based upon their substantial and non-isolated business activity within the state of Florida, as well as this judicial District.   Moreover, both Korman and KMG previously contracted to do business in Florida with EPI for purposes of acquiring licensing rights to TikiLIVE as well as related custom modules created and licensed by EPI.   After this contracting, both Defendants engaged in continuous and systematic activities, and as such have purposefully availed Defendants to the

forum, such that maintaining jurisdiction over Defendants in Florida shall not offend traditional notions of fair play and substantial justice.

6. Venue properly lies within this judicial district and division pursuant to 28 U.S.C. §1391 and §1400.

7. This Court has jurisdiction over the subject matter of this action pursuant to 17 U.S.C. §101 et al., 28 U.S.C. §1331, §1338 and §1332 because there exists a Federal Question under Copyright law, in addition to the fact that there is diversity of citizenship between the parties and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest, attorney's fees and costs.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### EyePartner and its Proprietary TikiLIFE Software

8. In January 2007, EPI launched www.TikiLIVE.com (the "TikiLive Website") to feature its proprietary software offerings for use in broadcasting and streaming video content.

9. Proximate that time, EPI began offering TikiLIVE v1.0 through: (a) a primary software offering that includes all the basic functionality for allowing broadcasting and streaming of video content (herein the "Core Software"), as well as (b) optional a la carte add-on modules that allow additional functionality and applicability of the Core Software – some of which can be custom configured based upon the requests and input of licensees.   EPI's customary business practice is – apart from some client templates – to maintain all rights to its Core Software as well as the additional modules (including custom modules) that EPI creates. Thus, EPI generally licenses the above offerings.  Should a licensee / client desire to own certain custom modules as a "work for hire," EPI is clear that such ownership would require a separate explicit written contract.

10. Since the early 2007 launch of TikiLIVE (including the Core Software as well as

additional optional modules), the platform has represented EPI's flagship broadcasting service to provide end customers with a plurality of comprehensive tools to produce, manage and broadcast live streaming video content – all through an off-the-shelf desktop or laptop computer.

11. The benefits of the Core Software is that it allows end customers to broadcast and view streaming video content and create unique channels in a manner that drastically cuts the cost of producing and sharing video content on-line through an organized and monitored process. As such, TikiLIVE serves as a turnkey package of web and video publishing tools.

12. EPI continues to modify, improve, and update its TikiLIVE software so that its software products remain up to date as HD broadcasting technology and other related systems advance. In particular, EPI updated its Core Software to version 3.0 ("TikiLIVE v3.0") in May 2011. EPI offered TikiLIVE v3.0 as both the Core Software and optional add-on modules.

13. Since the launch of TikiLIVE v3.0, this proprietary platform (as well as updates to that platform) represent one of the industry's state of the art systems for creating custom channels to broadcast live HD video content.

14. In May 2012, EPI launched and began licensing version 3.2 of its Core Software ("TikiLIVE v3.2"), which represented advancements and improvements to the v.3.0 system's channel management, electronic program guide, pay per view functionality and channel subscriptions.

15. Under TikiLIVE v3.2, EPI allows a larger variety of al a carte modules all of which are highly proprietary and owned exclusively by EPI, but available for licensure on a non-exclusive basis. Each of these modules can be modified for each customer's particular goals and needs. However, EPI maintains ownership of these custom modules unless there is an explicit written agreement that the modules are being created on a "work for hire" basis.

16.     Examples of these additional modules which function with the Core Software under TikiLive v.3.2 include the following:

| Add on Module | Functionality | Customizable? |
|---|---|---|
| Social Media Module | Allows live video content to be broadcast on popular Social Media outlets such as Facebook, where users may click on certain thumbnails of a channel or video post through simply copy and past functionality.   As such, the program allows end consumers to easily market and/or broadcast their HD content on Social Media through this proprietary and unique functionality offered by EPI. | Yes. |
| Set Top Box Interface | Allows for a more traditional TV viewing experience by allowing a network created by TikiLIVE to stream broadcast on ROKU Set Top Boxes to allow use of regular HDTV sets.   System allows streaming of internet content. | Yes. |
| Word Press Module | This add on module allows the TikiLIVE software (including v.3.0 and v. 3.2) to function with the popular WordPress system for creating and posting website content to allow access to streaming HD content.   Put simply, the WordPress system created by EPI is essentially a middlewear package which allows for the creation of an unlimited number of websites configured to allow broadcasting of HD content either live, pay per view or video on demand. | Yes. |
| Pay Per View | Allows for end customers to monetize video content through a pay per view feature that allows ticket sales to both live shows and video on demand content.    System allows for administrator cut of ticket sales and analytic reporting of ticket sales and revenues. | Yes. |

17.     The non-proprietary software elements of TikiLIVE v.3.2 are protected by Copyright Registration TX 0007655552 issued by the United States Copyright Office on March 26, 2013 (the "TikiLIVE v.3.2 Registration").    A print-out from www.Copyright.gov denoting the TikiLIVE v.3.2 Registration is attached as **Exhibit A** hereto.    As shown in **Exhibit A**, all rights regarding TikiLIVE v.3.2 is owned by EPI through a copyright assignment agreement.

18.     EPI exclusively owns and maintains valid and enforceable rights in the TikiLIVE v.3.2 Registration as to elements of both the Core Product as well as additional add-on modules.

<u>Kor Media and its Licensure of TikiLIVE and the additional WordPress Module</u>

19.     As previously addressed, Nic Mitchell ("Mitchell") is the Chief Technology Office for KMG and the administrator of the GloVue Website.  Upon further information and belief, Mitchell maintains primary responsibility for the maintenance of any and all software systems used to maintain the functionality and services offered under the GloVue Website including the ability to create IPTV channels for purposes of broadcasting and streaming HD video content.

20.     On or about May 13, 2011, Mitchell contacted EPI through the TikiLIVE Website to introduce himself and to identify an interest in licensing TikiLIVE.

21.     Between May 31 and June 7, 2011, Korman contacted EPI to discuss the TikiLIVE platform, its functionality, as well as its capabilities to add additional modules.

22.     On June 7, 2011, EPI sent to Korman its initial proposed licensing and software services agreement (the "June 7, 2011 Draft") regarding the Core Software of TikiLIVE v3.0.   A redacted copy of this draft agreement is provided as **Exhibit B**. EPI was clear that as to any modules in addition to the Core Software would be owned by EPI:

> [t]he TikiLIVE software, modules, modifications, custom development to the modules installed are considered extensions of the TikiLIVE core license.
>
> ….
>
> ***Unless explicit "work-for-hire" Agreements are executed, any and all source code of Licensed products owned by EP shall remain the intellectual property of EP[I].***  The source code of licensed products shall not be made available to the Client under this Agreement.

*See* **Exhibit B** (emphasis added).

23.     A few days after the June 7, 2011 Draft was circulated by EPI to Korman, Mitchell and Korman and EPI held a conference call on June 11, 2011 to further explore a licensing relationship with TikiLIVE v.3.0.   During that call, both Korman and Mitchell

discussed whether the TikiLIVE platform could be used as an engine to run WordPress developed websites for purposes of streaming and broadcasting HD video over the Internet. WordPress, an off-the-shelf web programming tool, is a common system used by a variety of professionals (and non-professionals) to build websites quickly and easily.

24.     On July 20, 2011, KMG was incorporated under the laws of the state of Nevada listing Korman as its sole manager.

25.     On August 10, 2011, EPI circulated a proposed "Software Delivery & Hosting Agreement (the "August 10, 2011 Draft") to David White (an advisor to Korman), which was later circulated to Korman's lawyer David LeGrand ("LeGrand"), and other individuals.   A redacted copy of the August 10, 2011 Draft is provided at **Exhibit C**.  As provided in the draft, EPI again placed Korman (and now KMG) on notice that under EPI's proposed terms:

> [t]he TikiLIVE software, modules, modifications, custom development to the modules installed are considered extensions of the TikiLIVE core license.
>
> ….
>
> ***Unless explicit "work-for-hire" Agreements are executed, any and all source code of Licensed products owned by EP shall remain the intellectual property of EP[I].***  The source code of licensed products shall not be made available to the Client under this Agreement.

*See* **Exhibit C** (emphasis added).

26.     On or about August 26, 2011, LeGrand circulated edits to the August 10, 2011 Draft (the "August 26, 2011 Draft") entitled "Software Delivery & Hosting Agreement."   A redacted copy is attached as **Exhibit D**.   Similar to **Exhibit C**, Section 9.1 of the August 26, 2011 Draft articulated the same limitations as to ownership of custom versions of modules to provide added functionality to the Core Software of TikiLIVE:

> The TikiLIVE software, modules, modifications, custom development to the modules installed are considered extensions of the TikiLIVE core license.
>
> ….

> ***Unless explicit "work-for-hire" Agreements are executed, any and all source code of Licensed products owned by EP shall remain the intellectual property of EP[I].***

See **Exhibit D** (emphasis added). As shown in **Exhibit B**, **Exhibit C** and later **Exhibit D**, by August 26, 2011, Defendants had acquiesced to the proposition that unless and until a separate explicit written work for hire agreement was signed with EPI, there would be no ownership interest by Defendants in any of the modules (including "custom development to the modules").

27.  On September 4, 2011, KMG registered the domain name for the GloVue Website, listing Mitchell as its administrative contact.

28.  On September 13, 2011 at 7:00 a.m., EPI President Tim Green ("Mr. Green") emailed Defendants to circulate a revised proposed agreement and license. A true and correct copy of this email is attached as **Exhibit E**. As addressed by Mr. Green to Korman and others, that proposed "License" included "optional hours" which "allows for [KMG] to build pages via Word Press outside the portal."

29.  On or about September 21, 2011, the parties finalized and KMG signed the September 21, 2011 contract entitled "Software License and Support Agreement" (the "September 21, 2011 Agreement"). A redacted copy of the September 21, 2011 Agreement is provided at **Exhibit F**. As provided in Section 2.1, the license grant provided that:

> [EPI] hereby grants to [KMG and its sublicenses] a non-exclusive, non-assignable . . . license to use the Software . . .

The definitions section of the September 21, 2011 Agreement (see **Exhibit F**) clarified that "Software" included "all software components in machine readable and/or printed form delivered by [EPI] to [KMG] pursuant to [the September 21, 2011 Agreement] as identified in the Schedule together with such additional software components in machine readable form that

[EPI] agrees in writing to provide to [KMG] from time to time [.]"   Likewise, the definitions section defined "Schedule" as "Schedule 1 attached to the" September 21, 2011 Agreement.

30.    "Schedule 1" of the September 21, 2011 Agreement identified "Additional Modules" in addition to the Core Software of TikiLIVE that optionally could be part of the non-exclusive and non-assignable licensed grant to KMG – if ordered by November 2011.

31.    Specifically, "Schedule 1" listed how a "Custom Word Press Multi-Site Delivery Module" could be ordered on or before November 20, 2011, which would require 120 hours for EPI to develop and then license to KMG which would allow the "ability to create unlimited subsites outside [the] TikiLIVE application" and the "ability to offer channels outside [of the] main portal."

32.    Section 11.8 of the September 21, 2011 Agreement entitled "Ownership of Source Code Within Licenses Delivered" addressed ownership of custom developed modules, including the "Custom Word Press Multi-Side Delivery Module" identified in Schedule 1:

> The software, modules, modifications, custom development to the modules installed is considered extensions of the software core license.
>
> **Unless explicit "work-for-hire" agreements [are] executed, any and all source code of licensed products owned by EP[I] shall remain the intellectual property of EP[I].**  The source code of licensed products shall not be made available to the [KMG] under this Agreement.

See **Exhibit F** (emphasis added).   As shown, this language mirrors **Exhibit C** and **Exhibit D** as shown above – such that it was clear that Defendants acquiesced on multiple occasions that unless there was a separate, written and explicit work for hire agreement that no module (including any custom module) in addition to the Core Software could be owned by KMG.

33.    Soon after the execution of the September 21, 2011 Agreement, EPI created a hosting relationship with KMG and gave certain access to EPI's computer servers (herein the

"Hurricane server") which maintained an encrypted form of TikiLIVE v3.0 (as well as later upgrades including TikiLIVE v3.2).

34.     The following day, Korman sent a copy of the signed September 21, 2011 Agreement as referenced in **Exhibit G** which is an email thread circulated the next day.     As shown in **Exhibit G**, KMG emailed EPI at 2:13 a.m. to address paying for "101 development hours" sufficient to develop the "Custom Word Press. . . Module" such that it could be licensed in 30 days or sooner.

35.     On or about October 6, 2011 at 3:32 a.m., Mitchell contacted Mr. Green and addressed how KMG would be operating under the name "GloVue" for purposes of providing HD broadcasting services on-line and how the business was hiring a "WordPress Development team."    A true and correct copy of this October 6, 2011 email is attached at **Exhibit H**.   As further shown in **Exhibit H**, Mitchell Mitchell also inquired about the status of EPI's development of the WordPress "widget" for purposes of allowing  "WordPress as a 'front-end' with TikiLIVE running the actual channel" of HD streaming content.

36.     Also shown in **Exhibit H**, Mr. Green responded minutes later at 3:36 a.m. that at that point in development the WordPress "widget" included certain blogging functionality, but the "more advanced" custom module EPI contemplated would allow "unlimited unique sites that [KMG and its] clients create on their own" such that "[e]ach site can be started in a matter of minutes and you can allow each broadcaster their won mailing list capture forms for marking."

37.     As likewise shown in **Exhibit H**, Korman stated at 10:19 a.m. that KMG was "committed to moving forward" to order this custom module and that KMG had "big plans" for the TikiLIVE software.    Later that same day, at 10:47 a.m., Korman authorized to have EPI "start to use hours outside what has been provided [in the September 21, 2011] Agreement" and

that KMG "will buy a block of hours when needed" to create the custom functionality.
Previously, at 8:46 a.m., Mr. Green responded that the EPI would have its account department
send KMG and Korman an "invoice" to "get rolling."   At 2:56 p.m., Mr. Green clarified that the
contemplated 100+ "hours were an option that were not triggered on the original [September 21,
2011] Agreement" since Korman had only provide authority to license that custom word press
functionality that day (October 6, 2011).   Moreover, Mr. Green noted how the email exchange
that day "is discussing Word Press features of these hours that have not been triggered.   Yes, its
all the same hours for the Word Press development."   See **Exhibit H**.

38.    Despite Mr. Green's clarification that the original September 21, 2011 Agreement
would govern ownership of the custom WordPress functionality and that such "custom
development of the modules [would be] extensions of the software core licenses . . . [u]nless
explicit 'work-for-hire agreements [were] executed" with KMG (*see* **Exhibit F**) – at no time did
Korman or any of Defendants suggest that there was any belief of ownership by KMG as to any
aspects of the source code or add-on module.

39.    On or about October 6, 2011 at 7:27 a.m., Mitchell had begun reviewing the
TikiLIVE v3.0 developed and then licensed by EPI – based upon the links afforded by Mr. Green
at 3:36 a.m. that day (at **Exhibit H**).   A true and correct copy of this 7:27 a.m. email is attached
at **Exhibit I**.   As shown, Mitchell emailed EPI and expressed how "TikiLive is much more
integrated with WordPress than [Mitchell] had understood.   This is good.   Yes, this works for
[KMG's] plans."

40.    Approximately a month later, Mr. Green emailed Korman on November 5, 2011
to address an update regarding custom module for WordPress to function with TikiLIVE v3.0.  A
true and correct copy of this email is provided at **Exhibit J**.    As shown Mr. Green confirmed

that EPI was "underway with the Wordpress widget" and that the "core TikiLIVE Team" was working on the programming.   Likewise, Mr. Green confirmed that based upon the quote of hours required for the custom module previously provided by EPI – that EPI would "not [be] charging [KMG] for this portion of the core tiki development" and that KMG would "start seeing the Wordpress widget come together as [EPI] install[ed] this" into the server.

41.     As shown in **Exhibit J**, by mid-November 2011, EPI was operating under the September 21, 2011 Agreement that it would take between 100 to 120 hours to create the custom WordPress module which would then be licensed to KMG under the clear terms of Schedule 1. Moreover, **Exhibit J** likewise alluded to the fact that portions of the software development for the WordPress functionality would not be charged to KMG but rather absorbed by EPI due to the licensing nature of the arrangement.

42.     The notion in **Exhibit J** was accorded and confirmed in later in communications by Mr. Green to Norbert Kabulis ("Kabulis") at KMG, including a November 11, 2011 email at 11:48 a.m.   A true and correct copy of this correspondence is provided at **Exhibit K.** In that correspondence regarding the development of the "module for WordPress", Mr. Green was clear that the 120 hours quoted to develop that custom module would be honored and that any overruns would be absorbed by EPI:

> I did bid at 120 hours and [EPI] will honor this as a flat rate price for this project and **we will sponsor the remaining hours – and add it to our solution as a future upgrade module**.   This will save you dozens of hours on this project to complete, bug fix and test.   [KMG] asked and [EPI] agreed that the second payment will come when we solidify the code so you can see something tangible.

*See* **Exhibit K** (emphasis added).   Accordingly, Mr. Green was clear with Kabulis that under the September 21, 2011 Agreement any overruns for programming would not be charged to KMG, and that the software created would be a "future upgrade module" such that other EPI licenses

could have the option to license such functionality.    Again, despite the clear indication that the WordPress module would be licensed by EPI to others – KMG failed to make any suggestion of ownership of any work for hire software rights in that module (or any form of source code).

43.    The exchange made in **Exhibit J** and **Exhibit K** - which clearly informed KMG that the custom WordPress functionality was merely licensed to KMG - was further confirmed in later correspondence.   For example, in correspondence a few months later on February 13, 2012, EPI programmer Alex Inman remarked how Mr. Green in the mid-November 2011 timeframe clearly confirmed that the WordPress module was not a work for hire:

> [Norbert] mentioned that [KMG] are interested in the Word Press Module "source code". Tim [Green] will review the requests and help provide [KMP] more information on the documentation on the WP module. Of course this module was sponsored by Eyepartner and in large part paid for by Eyepartner. ***This was not a "work for hire" deliverable.*** Tim [Green and KMP] had email correspondence regarding the same on November 10, 2011.

A copy of this communication is attached at **Exhibit L** hereto (emphasis added).

44.    At no time subsequent to **Exhibit L** did anyone at KMG clarify or comment on EPI's position that the custom WordPress module was a work for hire deliverable.    In addition, at no time after September 21, 2011 Agreement did KMG seek a separate and explicit work for hire agreement with EPI regarding the custom WordPress module.

45.    On or about January 24, 2012, Mr. Green contacted Mitchell and others at KMG regarding an inquiry about acquiring an API version (Application Programming Interface) of TikiLIVE.   A true and correct copy of this communication is provided at **Exhibit M.**   In that discussion, Mr. Green was specific that an "API is not in [KMG's] agreement because the TikiLIVE API Product is a different product than what [KMG] purchased.   [KMG] purchased the TikiLIVE platform License."   However, Mr. Green went further that if KMG was interested in bidding on the cost for an API version, which would allow KMG to create add on modules to

the functionality of TikiLIVE, then EPI would provide "a ROM quote to get this accomplished for [KMG] within 24 hours."   Despite this offer, KMG never agreed to such an API system for use with TikiLIVE.

46.    On or about February 10, 2012, Mr. Green followed up regarding whether KMG wanted an API version of the TikiLIVE system.   A true and correct copy of this correspondence is provided at **Exhibit N**.    As shown in **Exhibit N**, Mr. Green confirmed an API version of TikiLIVE it would require a different agreement:

> We learned last week that we are changing out the entire "License" product over to our "API product" and this is no small task. We are in the mist of blue printing this for you and going through all of your latest requests to use our v3.0 API rather than the license you purchased. So you know the API is a completely different product than the License you purchased from us.

Despite this, KMG ultimately opted against seeking a new agreement with EPI for purposes of obtaining an API version of TikiLIVE.

<u>Kor Media's Demands to Obtain Developmental Control and Access to EPI's Source Code</u>

47.    In May 2012, EPI transitioned KMG to the TikiLIVE v3.2 software under the prior September 21, 2011 Agreement.   Proximate that time, EPI introduced version 2.1 of its WordPress Module ("WordPress v2.1") on or about May 18, 2012 for purposes of providing KMG that functionality under the September 21, 2011 Agreement.

48.    By mid-May 2012, KMG had the benefit of a fully operational system for its GloVue Website, as well as the ability to create multiple websites of streaming HD content over the Internet through the WordPress functionality.

49.    Proximate the transition of KMG to the TikiLIVE v3.2 software (as well as the WordPress v2.1) – Defendants' stance regarding their relationship with EPI began to sour.

50.    On May 14, 2012 KMG arranged a call with EPI to "find a way either to get

[KMG] what we want or get [KMG] access to the databases and stuff so [KMG] can complete [KMG's] WordPress front end to TikiLIVE."  This also represented the first instance where KMG sought access to EPI's proprietary source code – despite the clear dictates of the September 11, 2012 Agreement specifically that "[t]he source code of licensed products shall not be made available to the [KMG] under this Agreement."  See **Exhibit F**.

51.     On May 23, 2012, Korman wrote to Mr. Green to address Defendants demand to obtain "developmental control" over the WordPress Module – which at the time KMG had been told was in the process of launching as WordPress v2.1.   A true and correct copy of this May 23, 2012 email is provided as **Exhibit O**.    As shown in **Exhibit O**, Korman admitted and acknowledged that the September 21, 2011 Agreement (**Exhibit F**) was a "Licensing Agreement having WordPress capability."   Despite this admission as well as the plain language of the September 21, 2011 Agreement (stating how "[t]he source code of licensed products shall not be made available to the [KMG] under this Agreement") – Korman states in **Exhibit O** the contradictory position that it was KMG's "clear understanding [ ] that we were to contractually have WordPress for our own development."   Moreover, despite the September 21, 2011 Agreement (specifically how "[u]nless explicit 'work-for-hire' agreements [are] executed, any and all source code of licensed products owned by EP[I] shall remain the intellectual property of EP[I]) - Korman in **Exhibit O** further makes the alarming suggestion that it was KMG's "understanding [ ] that [KMG] would own the WordPress module."

52.     In addition, Korman's May 23, 2012 email followed upon January 24, 2012 email exchange (see **Exhibit M**) regarding acquiring the API version of TikiLIVE:

> Our critical need is to have our proprietary WordPress API and to do this I understand that we would need from your side certain source code so we can link databases.

See **Exhibit O**. Lastly, Korman states in **Exhibit O** how he was "at a 'tipping point' and can no longer work around this issue."

53. The following day, Mr. Green responded to Korman's demands. A true and correct copy of this May 24, 2012 email at 3:13 a.m. is provided at **Exhibit P**. First, as to Korman's demand to obtain "developmental control" over the WordPress add-on module to TikiLIVE – Mr. Green remarked that such module was "proprietary," alluding to the fact that this was owned solely by EPI. This was further noted by Mr. Green in that despite the fact Schedule 1 of the September 21, 2011 quoted 120 hours to create the requested functionality, that EPI had "invested over 200 hours in the WP v1.0" – again suggesting that EPI had only billed a portion of that time based upon the licensed nature of the development.

54. Moreover, Mr. Green noted in **Exhibit P** that KMG would soon be given access to WordPress v2.0 - the development of which required an additional 300 hours of work by EPI, which again was nonetheless licensed to KMG under the September 21, 2011 Agreement:

> Now you may ask us when can you receive the V2.0 upgrade and how much should you be expected to pay for this upgrade. The answer is you pay nothing at all it is free. If you like the upgrade, you receive all of the benefits of our works and advancements since we delivered WP V1.0.

As such, clearly denoted the continued licensing nature of the TikiLIVE platform, as well as the add-on WordPress module.

55. By May 30, 2012, KMG confirmed the upgrade to TikiLIVE v3.2 as well as WordPress v2.1 based upon its prior discussions in the May 18, 2012 timeframe.

56. At no time subsequent to May 30, 2012 did KMG seek a separate and explicit written agreement for purposes of seeking any form of ownership of WordPress v2.1 or in TikiLIVE v3.2.

EPI's Confidentiality Efforts and KMG's Efforts to Circumvent that Confidentiality

57.      Since its January 2007 launch, EPI has placed safeguards on the ability to access the underlying source code of its TikiLIVE software.   As such, each version of Core Software of the TikiLIVE platform was considered highly proprietary and confidential and as such EPI has placed reasonable and appropriate technological measures regarding access to its PHP code.

58.      Likewise, at all time relevant, EPI has also maintained those same safeguards regarding its highly proprietary and confidential add-on WordPress Modules (including v1.0, v2.0, and v2.1) – and as such EPI has placed reasonable and appropriate technological measures regarding restricted access to such source code.

59.      At all time relevant to its relationship with KMG, EPI has always maintained agreements – akin to the September 21, 2011 Agreement – which plainly states that "[t]he source code of licensed products shall not be made available to the [KMG] under this Agreement."   See **Exhibit F**.

60.      In addition, when licensing the Core Software (and add-on modules like its WordPress modules) to licensees such as KMG, EPI has always encrypted that PHP type source code through reasonable and appropriate encryption technology through the Ion Cube protocol in order to prevent the platform from being altered or charged in any way by licensees.

61.      Apart from using reasonable encryption technologies, EPI maintains licensed versions of the TikiLIVE platform on EPI's Hurricane server(s), which operate off the CentOS Linux based system.    Under this Linux server, EPI created limited permissions such that licensees (including KMG) would not have the ability to alter or delete files and directories (but would allow the ability to access and use the encrypted programs and directories).

62.      On or before October 2012, KMG (without authority, notice or authorization from

EPI), created a directly on the Hurricane server a directory named:

**/home/glovue/public_html/wp-content/tiki-admin**

(hereinafter the "Tiki-Admin") on the server.   This directory did not exist in the EPI distribution of files and was specifically created to host files created and/or placed on the server by KMG. The Tiki-Admin directory within the Hurricane server created by KMG were all plain text unencrypted PHP files – totaling a whopping 485 files.

63.    Unknown to EPI, these 485 files within the Tiki-Admin directory all had similar names and file structures as those found in the directory of encrypted files available created by EPI at:

**home/glovue/public_html_tl/**

(hereinafter the "TL Directory").  The only difference was that the files in the TL Directory were all significantly larger than those in the Tiki-Admin directory, suggesting deletion of certain comments and notes found within EPI's encrypted files for the TikiLIVE platform.

64.    In late February 2013 during routine server maintenance regarding the Hurricane server that EPI had used to provide KMG access to its encrypted programs, including the TikiLIVE platform, discovered the Tiki-Admin system.   Moreover, it became quickly apparent that the 400+ files available in the TL Directory had been removed by KMG through a FTP file sharing protocol starting as early as October 2012.

65.    This included a series of significant file access and transfer of some 119 EPI files which formed part of TikiLIVE v3.2 via FTP during the February 25 to March 8 timeframe by KMG.

66.    Moreover, between October 2012 through March 14, 2013 there were 5,000+ file transfers, via the FTP protocol, to and from six (6) different IP addresses.

67.     While Defendants never alerted EPI to its clandestine conduct, review of the TL Directory revealed that the culprits accidently failed to cover his/her tracks and left a file "logon(orig).php" in that directory.    From review of that file, the following information was gleaned the following:

```
/**
*
* @ This file is created by Decodeby.US
* @ deZender Public (PHP5 Decompiler)
*
* @  Version           :    1.0.0.0
* @  Author            :    Ps2Gamer & Cyko
* @  Release on    :    30.05.2011
* @  Official site  :    http://decodeby.us
*
*/
```

As shown, this suggests that a PHP decomplier program called "deZender" offered at Decodeby.us was used to improperly seek access to EPI's Hurricane server, exceed the authority given by EPI, lift hundreds of encrypted files, and then remotely de-encrypt EPI's proprietary and confidential files.    Moreover, it appears that the deZender program was authored by a notorious hacker named "Ps2Gamer & Cyko" – who has publicly touted the ability to de-encrypt Ion Cube encrypted PHP files.

68.     From information and belief, it appears that KMG engaged "Ps2Gamer & Cyko" – or a related entity familiar with the deZender de-encryption software -  to remotely de-encrypt not only the Core Software of TikiLIVE v.3.2, but also the add-on module WordPress v.2.1 – and then returned the de-encrypted versions of the software onto EPI's Hurricane server.

69.     A side-by-side view regarding files found in Tiki-Admin directory as well as in TL Directory denote that once de-encrypted Defendants (and/or someone under the direction and

control of Defendants) removed any and all comments, copyright notices or notations which

denoted that EPI was the developer and owner of the code:



70.     Based upon this conduct, EPI on or about March 1, 2013 temporarily shut down

certain access rights to EPI's Hurricane server to impede Defendants from continuing to seek

access to EPI's proprietary and confidential information.[1]     In addition, it had EPI's counsel

prepare and serve a demand letter at 2:07 p.m. that day directed to Korman and KMG regarding

these efforts to de-encrypt, decompile and reverse engineer EPI's proprietary and confidential

source code for TikiLIVE v3.2 as well as the add-on WordPress v2.1.  A true and correct copy of

this cease and desist letter is provided at **Exhibit Q**.

71.     About two hours later, Korman emailed Mr. Green regarding Defendants'

egregious conduct.   A true and correct copy is attached as **Exhibit R**.   Instead of sounding

surprised regarding EPI's accusations of reserve engineering and de-encryption of the

proprietary and confidential TikiLIVE Platform, Korman instead appeared to concede the

---

[1] On or about March 6, 2013 EPI allowed Defendants to gain limited access to the Hurricane server for purposes of retrieving any client video files.  Likewise, subsequently on or about March 26, 2013 EPI prepared an external USB capable drive that included all of the client video files that were maintained by KMG on the Hurricane server and forwarded them via a courier to KMG's counsel.

misconduct.    Moreover, Korman endeavored to point the finger stating "So can you call me to explain this Action - all the while taking my money."   See **Exhibit R.**

72.    Later that night at 8:17 p.m., Korman emailed Mr. Green further admitting to the de-encryption and that he was having Mitchell working on "getting the details on what has been done . . ."   A true and correct copy of this email is attached as **Exhibit S.**

73.    The following day, Korman followed up regarding this serious issue of exceeding authority to obtain illicit copies of TikiLIVE v3.2 (which included WordPress v2.1 as an add on module).   A true and correct copy of this email is attached as **Exhibit T**.   As shown in **Exhibit T**, Korman admitted that individuals at KMG (including Mitchell) – or alternatively individuals under Defendants' direction and control - had access to de-encrypted copies of TikiLIVE v3.2 as well as WordPress v2.1.   Moreover, Korman mocked Mr. Green suggesting that since it would be easy for hackers to de-encrypt the TikiLIVE platform, that EPI should not pursue any action against Defendants for what they had willfully and illegally done:

> In reality Tim, [i]f you are so concerned that an international firm could easily decode and reverse engineer your program then that should be your concern.

74.    Subsequent communications between Defendants and EPI during this early March 2013 time confirmed that Defendants were using a de-encrypted copy of EPI's TikiLIVE v3.2 and WordPress v2.1 source code through a hosting service called HostGator, which most of its servers are located abroad including in India.   From review of publicly available information, HostGator has had a history of breaches of its remote servers by hackers.

75.    On or about March 13, 2013, EPI received additional correspondence from Defendants' attorneys.   A true and correct copy of that correspondence is provided at **Exhibit U**. Instead of addressing Defendants' conduct of exceeding authority and seeking to de-encrypt EPI's proprietary and confidential TikiLIVE v3.2 and WordPress v2.1 source code, Defendants

took the stance that the September 21, 2011 contract some how created complete ownership in the entire source code, and as such any such use or sale of the TikiLIVE v3.2 and WordPress v2.1 by EPI was "wrongful and should immediately cease."

76.     Upon information and belief, Defendants continue to possess unencrypted PHP versions of TikiLIVE v3.2 as well as WordPress v2.1 – which they are using as the engine to run and provide services under its GloVue Website.

77.     Upon information and belief, Defendants (without right, license or authorization of EPI) are creating derivative works based upon TikiLIVE v3.2 as well as WordPress v2.1 for purposes of offering services to Defendants' clients to create custom WordPress websites that allow streaming and broadcasting of HD content, creation of custom channels, and the ability to track and monetize such broadcasting (both as video on demand, as well as pay per views).

78.     Upon information and belief, Defendants (without right, license or authorization of EPI) are continuing to use, employ, and/or offer clients of GloVue access to run TikiLIVE v3.2 as well as WordPress v2.1 (or derivative works of that platform and related modules).

79.     As such, Defendants willful conversion of EPL's proprietary source code, misappropriation of that code, and improper and unauthorized continued use of that code remains on-going and as such as causing irreparable harm to EPL and its business.

**COUNT I**
**WILLFUL COPYRIGHT INFRINGEMENT**
**OF U.S. COPYRIGHT REGISTRATION TX 000765552 UNDER 17 U.S.C. §501(a)**
(against all Defendants)

80.     EPI re-alleges and incorporates by reference paragraphs one (1) through seventy-nine (79) as if fully set forth herein.

81.     This Count I is a claim for willful copyright infringement against all Defendants pursuant to United States copyright law based upon Defendants' knowing, willful and

clandestine efforts to exceed authority on EPI's Hurricane server, obtain copies of EPI's encrypted source code via direct access, remove those files via FTP, de-encrypt that source code through the aid of software authored by "Ps2Gamer & Cyko", and then use of de-encrypted source code to wage unfair competition against EPI.

82.    EPI owns all unencumbered rights, title and interest to Copyright Registration TX 0007655552 which protects certain non-proprietary software elements of TikiLIVE v3.2 (previously defined as the "TikiLIVE v3.2 Registration").   EPI's copyrighted works contain original material owned by EPI and constitute copyrightable subject matter under U.S. law.

83.    EPI offered source code registered under the TikiLIVE v3.2 Registration to Defendants in May 2012 timeframe (see **Exhibit P**) under the September 21, 2011 Agreement (see **Exhibit F**).   Based upon **Exhibit F**, it was clear that ownership in any and all source code, including any add-on modules (including but not limited to WordPress functionality) would be merely licensed by EPI to KMG, and as such there would be no work for hire ownership in the underlying source code (including any custom code contemplated in Schedule 1).

84.    Based upon this understanding, by late May 2012 Defendants agreed to upgrade to TikiLIVE v3.2 and the encrypted source code was placed on the Hurricane server for use by Defendants, and Defendants began use of an encrypted form of that source code for purposes of offering services to Defendants' GloVue clients at the GloVue Website.

85.    As such, starting in as early as late May 2012, Defendants had access via the Hurricane server to versions of the source code protected by the TikiLIVE v3.2 Registration, in which EPI had used reasonable means to protect including Ion Cube protocol.   This access continued upon on or about March 1, 2013 when EMI ceased Defendants rights to use the Hurricane Server due to Defendants' conduct addressed above.

86.     Upon information and belief, starting in as late as October 2012 and continuing up and until March 1, 2013, Defendants sought to exceed their access rights provided by EPI under the Hurricane Server's CentOS Linux based system (which had restricted KMG from altering or deleting files or directors that maintained TikiLIVE v3.2).

87.     During this time, Defendants exceeded authority through clandestine means of the Hurricane Server's CentOS Linux based system, obtained encrypted copies of source code protected by the TikiLIVE v3.2 Registration, and then used a PHP decompiler program called "deZender" offered at Decodeby.us to improperly crack the Ion Cube encryption.

88.     Once de-encrypted, Defendants lifted hundreds of files (via the FTP file sharing protocol) that comprise source code protected by the TikiLIVE v3.2 Registration.  To mask their elicit actions, Defendants attempted to place these de-encrypted files back on EPI's server, all of which failed to include the previous copyright notices found in the TikiLIVE v3.2 platform:



89.     As shown in the above, the de-encrypted source code created by Defendants to provide broadcasting and streaming of HD content is substantially similar to the source code protected by TikiLIVE v3.2 Registration.

90.     Defendants actions to use the "deZender" code available at Decodeby.us and used by hackers such as "Ps2Gamer & Cyko" to de-encrypt EPI's Ion Cube encrypted PHP files shows knowing, willful and clandestine actions all designed to obtain copies of Plaintiff's TikiLIVE v3.2 protected source code, and then employ that code outside the licensed rights accorded by the September 21, 2011 agreement.

91.     As the previous chronology articled above is clear that the TikiLIVE v3.2 protected source code was not a work for hire as confirmed by EPI's Alex Inman on February 13, 2012:

> [Kabilus] mentioned that [KMG] are interested in the Word Press Module "source code". Tim [Green] will review the requests and help provide [KMP] more information on the documentation on the WP module. Of course this module was sponsored by Eyepartner and in large part paid for by Eyepartner. ***This was not a "work for hire" deliverable.*** Tim [Green and KMP] had email correspondence regarding the same on November 10, 2011.

See **Exhibit L** (emphasis added).

92.     Accordingly, Defendants fail to have any ownership rights (or any form of rights under the September 21, 2011 agree) that would allow for de-encryption and use of the source code as they are currently engaged in.

93.     As such, Defendants' infringement is willful and malicious, and is continuing after EPI's registration of the copyrights works with the United States Copyright Office in May 2013.

94.     The copying, making derivative copies, reproduction or distribution by the Defendants of the copyrighted works was without authorization by EPI, and therefore constitutes an infringement in violation of 17 U.S.C. §501.

95.     EPI has suffered a compensable injury by reason of the infringing activities of the Defendants and EPI will continue to suffer irreparable injury unless the Defendants infringing activities are permanently enjoined.

96.     The Defendants' infringing activities were done knowingly and in a willful and reckless disregard of EPI's rights.

97.     EPI has been forced to retain the undersigned counsel to enforce its rights to copyright and is entitled to reasonable fees from the Defendants.

**COUNT II**
**DESTRUCTION OF COPYRIGHT MANAGEMENT INFORMATION**
**IN VIOLATION OF 17 U.S.C. § 1202**
(against all Defendants)

98.     EPI re-alleges and incorporates by reference paragraphs one (1) through ninety-seven (97) as if fully set forth herein.

99.     This Count II is an action under the Digital Millennium Copyright Act's "Integrity of copyright management information" provisions relating to Defendants' willful actions of removing any and all copyright notices, all references that EPI was the owner of the underlying source code regarding the TikiLIVE platform, and modifying such conduct to remove the ability for third-parties to recognize that these files used for streaming and broadcasting of this content are owned by EPI.

100.    This provision of the Millennium Copyright Act makes clear that:

No person shall, without the authority of the copyright owner or the law . . .
(1)     intentionally remove or alter any copyright management information,
(2)     distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
(3)     distribute, import for distribution, or publicly perform works, copies of works, . . . knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will

induce, enable, facilitate, or conceal an infringement of any right under this title.

101.    Under 17 U.S.C. 1202(c), the term "copyright management information" is defined to include "information conveyed in connection with copies or phonorecords of a work ... including in digital form" such as:

> (i)     The title and other information identifying the work, including the information set forth on a notice of copyright.
> (ii)    The name of, and other identifying information about, the author of a work.
> (iii)   The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.
> (iv)    Terms and conditions for use of the work.
> (v)     Identifying numbers or symbols referring to such information or links to such information.

102.    As shown below, EPI was careful when programming its TikiLIVE v.3.2 platform to include copyright management information to clearly provide (i) the title of the work, (ii) a notice of copyright ownership by EPI, (iii) the name of the author of the work (here EPI), (iv) the name of the copyright owner of the work (here EPI), and (v) sufficient indicia to identify the ownership of the work including a link to www.eyepartner.com:



103.    As is further shown in the side-by-side comparison above, after Defendants

exceeded access to EPI's Hurricane server (and the access limitations set forth under its CentOS Linux based system), Defendants used an FTP protocol to obtain copies of the encrypted versions of TikiLIVE v.3.2 platform, de-encrypted this source code through clandestine means (including use of "deZender" code available at Decodeby.us developed by "Ps2Gamer & Cyko") and then once Defendants accessed the code, they intentionally removed any and all of EPI's copyright management information.

104.    Accordingly, the combination of de-encryption of the TikiLIVE v.3.2 platform and removal of EPI's copyright management information risks EPI's ability to allow third-parties to become aware of the fact that TikiLIVE v.3.2 is protected by a valid United States copyright registration.

105.    Moreover, Defendants' conduct will allow Defendants to improperly copy, redistribute and create derivative works of the TikiLIVE v.3.2 platform without notice to third parties (such as end customers) as to the true authorship and source of those programs.

106.    Defendants knew or should have known that their actions of removing EPI's copyright management information violated the integrity of TikiLIVE v.3.2 platform under 17 U.S.C. § 1202.

107.    Defendants received and shall continue to receive a direct financial benefit from these willful and clandestine actions.

108.    By continuing to use, modify, and operate versions of the TikiLIVE v.3.2 platform (without alerting third-parties regarding EPI's copyright management information), Defendants are committing vicarious and/or contributory violations of the integrity of EPI's source code.

109.    As shown by the alarming conduct addressed above, Defendants' willful,

intentional, deliberate and malicious acts of violation of the integrity of EPI's copyright management information has and will continue to damage EPI.

110.    Defendants' acts of violation of the integrity of EPI's copyright management information has damaged and will continue to damage EIP in a manner that is irreparable in nature.

111.    EPI is without an adequate remedy of law.

**COUNT III**
**CIRCUMVENTION OF COPYRIGHT PROTECTION SYSTEMS**
**IN VIOLATION OF 17 U.S.C. § 1201(a)**
(against all Defendants)

112.    EPI re-alleges and incorporates by reference paragraphs one (1) through ninety-seven (111) as if fully set forth herein.

113.    This Count III is an action under the Digital Millennium Copyright Act's circumvention of copyright protection systems.

114.    EPI protected the intellectual property associated with TikiLIVE v.3.2 platform, including reasonable technological measures that included (a) EPI use of the CentOS Linux based system to limit access rights to the TikiLIVE v.3.2 source code, including limits on modifying, changing or alerting such code while on that server and (b) use of industry standard encryption standards available under the Ion Cube encryption system for PHP type code, and (c) contractual limitations proscribed under its September 21, 2011 Agreement with KMG.

115.    In the ordinary course of allowing KMG licensed rights to use of the TikiLIVE v.3.2 platform, these reasonable measures employed by EPI prevented, restricted and otherwise limited the exercise of EPI's protectable rights in this source code accorded under 17 U.S.C. § 101 *et. seq.*    As such, these technological measures employed by EPI effectively and appropriately controlled access to works protected under U.S. Copyright law.

116.    Defendants' aforementioned conduct of using an FTP file exchange protocol to obtain encrypted copies of the TikiLIVE v.3.2 platform, removal of those hundreds of files from the Hurricane server, and then use of "deZender" code to de-encrypt EPI's software – was all actions designed to circumvent the technological measures employed by EPI for purposes of effectively and reasonably controlling access to the source code of the TikiLIVE v.3.2 platform protected under U.S. Copyright law.

117.    Defendants' use of the "deZender" code to de-encrypt EPI's software was done solely for the limited purpose of circumventing EPI's reasonable technological measures to protect the underlying source code of the TikiLIVE v.3.2 platform.

118.    Moreover, the "deZender" code was primary designed – and then later used (or employed) either directly or indirectly by Defendants - as a means of de-encryption of PHP programs encrypted by the Ion Cube platform.

119.    Lastly, Defendants' conduct fails to qualify as "reverse engineering" under 17 U.S.C. § 1201(f) for a variety of legal basis, including but not limited to, the fact that these clandestine actions were not designed to enable identification or analysis of any issues with the TikiLIVE v.3.2 platform -  but instead to unlock and use the underlying code for Defendants' pecuniary gain – all in unfair competition against EPI.

120.    Moreover, Defendants' conduct further fails to qualify as "reverse engineering" under 17 U.S.C. § 1201(f) as Defendants' circumvention allowed and created access to over 100+ files, not just the files regarding WordPress v. 2.1.  As such, upon information and belief, Defendants' circumvention included efforts to de-encrypt all of the TikiLIVE v.3.2 (not just the custom module for WordPress v.2.1).

121.    Defendants knew or should have known that its conduct would result in source

code that directly infringes EPI's rights to the TikiLIVE v.3.2 platform.

122. Defendants knew or should have known that their use of the "deZender" code as a circumvention tool to EPI's reasonable and customary technological measures would violate the Digital Millennium Copyright Act' prohibition afforded under 17 U.S.C. § 1201(a) against circumvention of such reasonable encryption means.

123. Defendants knew or should have known that the "deZender" code system was primarily marketed and advertised as a tool to circumvent encrypted PHP programmed source code protected by the Ion Cube encryption protocol.

124. By using, advertising and offering for sale its GloVue website – and its ability to stream and broadcast HD video through the Internet – Defendants are distributing integral material, otherwise inducing infringement by third parties and end customers, all through its past circumvention of EPI's technological measures.   As such Defendants' conduct is vicarious.

125. Defendants are receiving and continuing to receive a direct financial benefit from their clandestine actions in direct violation of the Digital Millennium Copyright Act' prohibition afforded under 17 U.S.C. § 1201(a) against circumvention.

126. Defendants were aware of these violation and had ability to control or prevent access to the TikiLIVE v.3.2 platform.

127. Defendants' willful, intentional, deliberate, and malicious actions at circumvention of EPI's technological measures has and will continue to damage EPI.

128. Defendants' actions of circumvention of EPI's technological measures has and will continue in an manner that is irreparable in nature.

129. EPI is without an adequate remedy at law.

## COUNT IV
## MISAPPROPRIATION OF TRADE SECRETS – FLA STATS. CHAPTER 688
(against all Defendants)

130.    EPI re-alleges and incorporates by reference paragraphs one (1) through ninety-three (129) as if fully set forth herein.

131.    This Count IV is an action for violation of the Florida Uniform Trade Secret Act (Fla. Stat. § 688 et seq.) against all Defendants efforts to exceed authority with regard to access rights to the Hurricane server to illicitly obtain the proprietary and confidential elements of TikiLIVE v.3.2 core software as well as the optional add-on module WordPress v.2.1.

132.    On information and belief, Defendants, either directly or through the actions of their Chief Technology Officer Mitchell, willfully, knowingly and without authorization accessed or caused to be accessed the Hurricane server, which housed and maintained encrypted versions of TikiLIVE v.3.2 core software (which included the optional add-on module WordPress v.2.1).

133.    As provided above in greater detail, Defendants, either directly or through the actions of Mitchell, willfully, knowingly and without authorization took certain encrypted data and/or supporting files and directories which are confidential and/or proprietary to EPI's computer system and/or computer network.

134.    EPI's proprietary information present in TikiLIVE v.3.2 core software (as well as the module WordPress v.2.1) derives economic value from not being generally known to, and not being readily ascertainable (unless through proper means) by, other persons who may be able to obtain economic value from its disclosure or use.

135.    EPI's proprietary information has been the subject of efforts that are reasonable

under the circumstances to maintain the secrecy of that information – including use of (a) EPI use of the CentOS Linux based system to limit access rights to the TikiLIVE v.3.2 source code, including limits on modifying, changing or alerting such code while on that server and (b) use of industry standard encryption standards available under the Ion Cube encryption system for PHP type code, and (c) contractual limitations proscribed under its September 21, 2011 Agreement with KMG.

136.    Between approximately October 2012 and March 1, 2013, without EPI's authorization or knowledge, Defendants misappropriated EPI's trade secrets for their own use and benefit to EPI's detriment – including through use of de-encryption technologies designed to protect the trade secret nature of the underlying information created and possessed by EPI.

137.    EPI has suffered a compensable injury by reason of Defendants' misappropriation of trade secrets as outlined above, and will continue to suffer an irreparable injury unless Defendants' conduct is preliminarily and then permanently enjoined.

138.    Upon information and belief, the conduct of the Defendants as outlined in this Count IV was engaged in with willful, wanton or reckless disregard for EPI's rights, so as to justify an award of exemplary damages under Fla. Stat. §688.004(2), and attorney's fees under Fla. Stat. §688.005.

**COUNT V**
**CONVERSION OF CONFIDENTIAL AND PROPRIETARY INFORMATION**
(against all Defendants)

139.    EPI re-alleges and incorporates by reference paragraphs one (1) through ninety-three (138) as if fully set forth herein.

140.    This Count V is an action for conversion under the common law of the state of Florida regarding Defendants' actions to take – without EPI's authority - proprietary and

confidential elements of TikiLIVE v.3.2 core software as well as the optional add-on module WordPress v.2.1 (specifically those elements which may not necessarily rise to the level of a trade secret as defined under the Florida Uniform Trade Secret Act, Fla. Stat. §688 et al).

141.    From October 2012 up until March 1, 2013, on multiple occasions Defendants did knowingly, willfully, and unlawfully, and with intent to steal, commit an act of conversion of the EPI's encrypted source code that forms the basis of TikiLIVE v.3.2 core software (as well as the optional add-on module WordPress v.2.1).

142.    This was all orchestrated by Defendants with the intent to deprive permanently or for an indefinite time of its rightful possession, access to, and use of, such confidential information, and to deprive EPI of the value of this information, well knowing that Defendants were committing wrongful acts.

143.    Defendants have acted knowingly, willfully, and unlawfully.

144.    As a direct and proximate result of the conduct of Defendants, EPI has suffered the deprivation of its property, namely, its confidential business information (including source code, files, and directories) which comprise certain aspects of TikiLIVE v.3.2 core software (as well as the optional add-on module WordPress v.2.1) which may not rise to the level of a trade secret under Fla. Stat. § 688 et seq.

145.    The actions of Defendants have seriously interfered with EPI's enjoyment of ownership rights over this information.  Defendants have improperly exercised acts of dominion and unauthorized access over EPI's intellectual property, namely his proprietary source code, and thus have without consent created the opportunity to disclose, distribute, and/or sell EPI's valuable data and informational assets which provide EPI a competitive advantage.

146.    As a direct and proximate result of the aforementioned conduct of Defendants, EPI has suffered and will continue to suffer irreparable injury.

147.    As a direct and proximate result of the aforementioned conduct of Defendants, EPI has also sustained monetary loss, including the loss of use of EPI's property for which EPI is entitled to recover compensatory and, upon authorization of the Court, punitive damages.

148.    As such, EPI seeks (i) compensatory damages equal to the lost use of EPI's source code (including its files and directories) for certain aspects of TikiLIVE v.3.2 core software (as well as the optional add-on module WordPress v.2.1) and other damages proximately caused by the misconduct of Defendants, (iii) a preliminary and thereafter permanent injunction; and (b) costs of this action and such additional relief as the Court deems appropriate or to which EPI may be entitled by law.

## COUNT VI
## COMMON LAW UNJUST ENRICHMENT
(against all Defendants)

149.    EPI re-alleges and incorporates by reference paragraphs one (1) through ninety-three (148) as if fully set forth herein.

150.    This Count VI is an action under the common law of the State of Florida for unjust enrichment against all Defendants.

151.    Defendants have individually and collectively received and will continue to receive unlawful gains from the misconduct enumerated above, including without limitation their taking of EPI's confidential and proprietary information regarding the TikiLIVE platform, de-encryption and then copying of copyrighted source regarding TikiLIVE v3.2, willful misappropriation of EPI's trade secrets, as well as conversion of EPI's property.

152.     In addition, Defendants have received and will continue to receive unlawful gains from the misconduct enumerated above including unauthorized access to EPI's Hurricane server, as well as the computer source code, files and directories that form the TikiLIVE v.3.2 core software (as well as the optional add-on module WordPress v.2.1).

153.     Defendants have acted knowingly, willfully, and unlawfully with intent to injure EPI.

154.     Unless prohibited from doing so by this Court, Defendants will be unjustly enriched by their illicit activities.

**COUNT VII**
**COMMON LAW TRESPASS TO CHATTELS**
(against all Defendants)

155.     EPI re-alleges and incorporates by reference paragraphs one (1) through ninety-seven (154) as if fully set forth herein.

156.     This Count VII is a claim for trespass to chattels under Florida common law against Defendants.

157.     Between October 2012 and March 1, 2013, Defendants knowingly, willfully, and unlawfully committed a trespass to chattels of EPI in that Defendants did, without authorization or permission, trespass upon the EPI's property, namely its Hurricane server, as well as the underlying computer source code, files and directories that form the TikiLIVE v.3.2 core software (as well as the optional add-on module WordPress v.2.1) – all in order for Defendants to upload via FTP protocols and then later de-encrypt and modify proprietary source code located on the Hurricane server developed and wholly owned by EPI.

158.    Defendants committed the aforementioned conduct with the intent and purpose of depriving EPI of the competitive advantages, benefits, and value contained within the information taken, for the purposes of gaining an unfair competitive advantage in the market.

159.    EPI has suffered irreparable injury, as more particularly outlined above, and will continue to suffer irreparable injury without preliminary and permanent injunctive relief.

160.    EPI has sustained monetary losses as a direct and proximate result of the aforementioned conduct of Defendants.

### COUNT VIII
### FLORIDA COMMON LAW UNFAIR COMPETITION
(against all Defendants)

161.    EPI re-alleges and incorporates by reference paragraphs one (1) through ninety-seven (160) as if fully set forth herein.

162.    This Count VIII is an action under the common law of the State of Florida for unfair competition against all Defendants.

163.    By misappropriating EPI's proprietary works and other intellectual property and passing them off as their own, Defendants have utilized unfair means to usurp the good will and reputation of EPI and its well known TikiLIVE platform for streaming and broadcasting HD content via the Internet.

164.    Defendants are misappropriating and falsely describing to the general public the origin and source of their materials (under the GloVue Website) so as to cause confusion and mistake by the consumer as to the source and origin of their services and documents.

165.    EPI has no adequate remedy at law if this Court does not enjoin Defendants' activities, and EPI is suffering irreparable harm and injury to his reputation.

166.     Upon information and belief, Defendants' acts are willful, wanton, intentional and malicious.


## COUNT IX
## CONSTRUCTIVE TRUST AS TO COPYRIGHT
## IN DERIVATIVE WORKS OF DE-ENCRYPTED VERSIONS OF TIKILIVE
(against all Defendants)

167.     EPI re-alleges and incorporates by reference paragraphs one (1) through ninety-seven (166) as if fully set forth herein.

168.     This Count IX is an action under the common law of the State of Florida for a constructive trust over ownership, rights, title and interest in any de-encrypted versions of the Core Software for TikiLIVE, including any add on modules (including but not limited to WordPress) which was de-encrypted by Defendants, as well as those derivative works of authorship in any and all source code (and/or proprietary information) marketed under the name GloVue (including but not limited to information accessible at the GloVue Website).

169.     As provided in greater detail above, Defendants, between October 2012 and March 1, 2013, used improper means to de-encrypt the Core Software for TikiLIVE (as well as certain optional add-on modules such as the WordPress module), and then gained access and developmental control of that de-encrypted software.

170.     Defendants – including through the aide of Mitchell – are now modifying, adding to, and changing the underlying source code of these files and directories.

171.     Upon information and belief, Defendants have clandestinely modified the TikiLIVE Platform (as well as its add-on modules) for purposes of offering on-line various broadcasting and steaming services of HD content over the internet through its GluVue website.

As such, upon further information and belief this software constitutes various derivative works of authorship protectable under U.S. Copyright law.

172.    In equity and in good conscious, the copyright rights relating to these altered and changed versions of the TikiLIVE source code and add-on modules is a separate intellectual property asset, which is based and derived solely upon the TikiLIVE platform previously licensed from EPI by KMG.

173.    Based upon the foregoing chronology, an injustice would be served if KMG would obtain, seek or employ any form of copyright right to these derivative works, which of course was based and rooted solely upon EPI's programming efforts, research and development, and hundreds of hours of work.

174.    Accordingly, equity demands that a constructive trust be placed over any such works that would qualify as derivative works of authorship, as well as any additional source code, and any such related intellectual property rights.

## **PRAYER FOR RELIEF**

WHEREFORE, for all of the foregoing reasons, Plaintiff, EYEPARTNER, INC. requests this Honorable Court grant relief in the following manner:

a.    Defendants and their agents, servants, employees, and those people in active concert or participation with them be preliminary and permanently enjoined from infringing on Plaintiff's copyright registration in the TikiLIVE software.

b.    Be awarded all other monetary remedies available under the Copyright Act, including but not limited to, compensatory damages, statutory damages, treble damages, interest, costs and attorney's fees as legally permitted.

c.    Award damages and related relief available under Digital Millennium Copyright Act for Defendants' actions under Sections 1201(a) and 1202 for Defendants' acts of circumvention of reasonable technological measures as well as Defendants' acts of destroying copyright management information.

d.    Defendants and their agents, servants, employees, and those people in active concert or participation with them be preliminary and permanently enjoined from using, accessing, misappropriating and disseminating Plaintiff's trade secret related information regarding the TikiLIVE platform, including but not limited to source code, files, directories and related information.

e.    Be awarded all monetary remedies available under the Florida Uniform Trade Secret Act, including but not limited to damages, exemplary damages, interest, costs and attorneys' fees as legally permitted.

f.    Place a constructive trust over all United States and international copyright rights regarding any works of authorship which may qualify as derivative work prepared by Defendants;

g.    Enjoin Defendants from filing any copyright registrations regarding such works of authorship;

h.    Enter a judgment against Defendants in an amount suitable to recompense EPI for the loss of copyright licensing revenues; and

i.    Be awarded all other monetary remedies available under the common law of the State of Florida based upon Defendants' actions of conversion, unjust enrichment and unfair competition, including but not limited to, penalties and fines, compensatory damages, treble damages, disgorgement of profits, interest, costs and attorney's fees as legally permitted by each count respectively.

j.    Defendants and their agents, servants, employees, and those people in active concert or participation with then be preliminary and permanently trespass to Plaintiff's chattels regarding access rights to its proprietary and confidential information regarding the TikiLIVE platform, including but not limited to source code, files, directories and related information.

k.    Be awarded all monetary remedies regarding Defendants' trespass to Plaintiff's chattels including but not limited to damages, treble damages, interest, costs and attorneys' fees as legally permitted.

l.    Any and all other relief that this Honorable Court deems just.

**JURY TRIAL DEMANDED**

Plaintiff EYEPARTNER, INC. hereby demands trial by jury on all issues so triable.

Respectfully submitted this 9th day of April, 2013.

/s/ *Robert H. Thornburg*

_____

Robert H. Thornburg, Florida Bar No. 630829
rthornburg@addmg.com
Matthew N. Horowitz, Florida Bar No. 98564
mhorowitz@addmg.com
ALLEN, DYER, DOPPELT, MILBRATH
   & GILCHRIST, P.A.
1221 Brickell Ave., Suite 2400
Miami, FL  33131
Telephone:     305-374-8303
Facsimile:     305-374-8306

*Attorneys for EyePartner Inc.*