## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

EYEPARTNER, INC.,
a Florida Corporation,                                  CASE No.: 4:13-cv-10072-JLK

      Plaintiff,

v.

KOR MEDIA GROUP LLC d/b/a GLOVUE
a Nevada Limited Liability Company, and
ROBERT KORMAN, an individual,

      Defendants

_____/


## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff EYEPARTNER, INC. ("Plaintiff" or "EP") moves for preliminary injunction enjoining Defendants KOR MEDIA GROUP LLC d/b/a GLOVUE ("KMG") and Robert Korman ("Korman") (collectively, "Defendants") from maintaining, using, distributing, marketing, disclosing, benefiting from, promoting, selling, offering for sale and licensing EP's copyrighted TikiLIVE software platform, and engaging in acts of unfair competition based upon Defendants rogue efforts to clandestinely decrypt EP's confidential intellectual property and subsequent unlicensed use in direct competition.  In support, EP provides the following support:

## I.    FACTUAL BACKGROUND

This cyber-piracy action centers on a series of clandestine events orchestrated by EP's former licensee KMG (under the direction of Korman) of proprietary software in the competitive field of streaming video content on-line.  EP is a Florida corporation, headquartered in Marathon, that focuses on programming and developing proprietary software that helps to easily and reliably broadcast high-definition content over the Internet.[1]  Green Decl., ¶ 1.  EP markets and offers this proprietary and copyrighted software under the name TikiLIVE, which represents the company's flagship offering.  *Id.; see also* D.E. 1, ¶ 2.

### A.  The TikiLIVE Platform and its Functionality.

First launched in January 2007, TikiLIVE represented groundbreaking technology in the field of broadcasting through the Internet Protocol Television ("IPTV") system. Green Decl., ¶ 2; D.E. 1, ¶ 2, 8.  More specifically, the TikiLIVE v.1.0 software launch provided a functional platform which allowed broadcasting of streaming video content (the "Core Software") as well as optional *al la carte* add-on modules that allow additional functionality which enhances the Core Software – all of which are available for custom development upon a licensee's request.

---

[1] In support of Plaintiff's motion for preliminary injunction, EP relies upon **Exhibit A**, the Declaration of Tim Green,  its President and CEO (hereinafter referenced as  "Green Decl., ___").

Green Decl., ¶ 3. Benefits of the Core Software include allowing end-customers to broadcast, view, and share video content through unique channels in a manner that cuts the cost of video production and editing, and allows video sharing through an organized and monitored process. Green Decl., ¶ 4; D.E. 1, ¶ 10. Based on this turn-key offering, the TikiLIVE system quickly grew in popularity. *See id.*

EP continued to modify and improve its TikiLIVE platform with enhanced functionality and scalable features. By May 2012 EP launched version 3.2, which represented significant advancements and improvements to the prior channel management, electronic program guide, and pay-per-view subscriptions. Green Decl., ¶ 5; D.E. 1, ¶ 13-14. This version is protected by U.S. Copyright Registration TX 000765552 (the "TikiLIVE v3.2 Registration"). This version includes add-on modules that function with the Core Software. *Id.* at Ex A.

**B. KMG's Interest in TIKILIVE and its Efforts to Seek a Non-Exclusive License**

In May 2011, Las Vegas based programmer Nic Mitchell ("Mitchell") contacted EP expressing an interest in TikiLIVE's functionality. *See* **Exhibit B**. Korman joined these conversations between May 31 and June 7, contacting EP to discuss not only TikiLIVE's Core Software but also the options to add-on modules. This resulted in a June 7, 2011 initial proposed software license (at that time for Version 3.0 of TIKILIVE). *See* D.E. 1, Ex B. As to ownership of the proposed licensed code, EP made clear that "[u]nless explicit 'work-for-hire' agreements are executed, any and all source code of licensed product shall remain the intellectual property of EP." *Id.* A teleconference between Korman, Mitchell and EP ensued on June 11, 2011 to further explore a relationship under the circulated proposed license. Green Decl., ¶ 6; That call included Korman's desire to run WordPress to rapidly create websites pages that would feature streaming HD content. *Id.* After EP confirmed it could deliver a WordPress module to

complement the Core Software, Korman incorporated KMG under Nevada law – later making Mitchell his chief technology officer. *See* **Exhibit C**.

After advancing these licensing discussions further, EP circulated a revised software agreement on August 10, 2011, which was addressed by Korman's attorney David LeGrand ("LeGrand").   D.E. 1, Ex. C.   Akin to the June 7, 2011 license, this likewise made clear that under any licensing scenario any modules developed by EP would be owned exclusively by EP – unless a separate written agreement was formed.   *See id*.   Likewise, the draft crystallized that "[t]he source code of licensed products shall not be made available to the Client under this Agreement" – thus confirming that licensed source code would be encrypted.   *See id;   see also* Green Decl, ¶ 7.   LeGrand, Korman's attorney, circulated edits to the license on August 26, 2011 and in doing so acquiesced in Section 9.1 the clear understanding by KMG and Korman that ownership of the Core Software and any add-on modules customly created in the venture would be owned solely by EP. *See* D.E. 1, Ex. D.

Defendants registered a website domain for the proposed venture on September 4, 2011 (www.GloVue.com - hereinafter the "GloVue Website") to launch their licensed version of TikiLIVE having the add-on WordPress functionality.   *See* **Exhibit D**.   The following week EP circulated a proposed license that included proposed man-hours and a budget necessary build and program the desired add-on Word Press portal to complement the Core Software.   *See*   D.E. 1, Ex. E.

The parties finalized the licensing relationship on September 21, 2011 through a software license akin those previously circulated on June 7 and August 26.   *See*   D.E. 1, Ex. F.   The agreement included a non-exclusive and non-assignable limited grant for KMG to use the TikiLIVE software.   *See id.* at Section 2.2.   Such "software" was specifically defined as "all software components in machine readable and/or printed form" delivered under the agreement,

including those listed in the attached Schedule.  *Id.*  Moreover, the attached Schedule identified how KMG could order by November 20, 2011 a Custom WordPress Multi-Site Delivery module – which would require 120 hours for EP to program and build.  *See id.*  Lastly, the signed agreement included Section 11.8 addressing how such custom developed modules would be owned solely by EP unless a writing was agreed to otherwise:

> The software, modules, modifications, custom development to the modules installed is considered extensions of the software core license.
>
> ***Unless explicit "work-for-hire" agreements [are] executed, any and all source code of licensed products owned by EP[I] shall remain the intellectual property of EP[I].***  The source code of licensed products shall not be made available to the [KMG] under this Agreement.

*See id.* (emphasis added).   The next day Korman wrote to EP to address payment for development hours sufficient to create the contemplated WordPress module.  D.E. 1, Ex. G.

Pursuant to the September 21, 2011 agreement, and a later hosting agreement, EP agreed to host an encrypted version of the TikiLIVE platform (both the Core Product and the planned add-on modules) on EP's hurricane server, as well as provide additional file space to host video content for KMG.  Green Decl., ¶ 8.  Two week later, EP exchanged lengthy emails with KMG and its team, where Defendants expressed they were "committed to moving forward" regarding the WordPress add-on for which it had "big plans".  D.E. 1, Ex. H.  Likewise, Mitchell, upon review of the TikiLIVE system, addressed how "TikiLIVE is much more integrated with WordPress than [Mitchell] had understood" and further explained how "this works for [KMG's] plans." *Id.*  In short, upon access to the TikiLIVE platform, KMG realized its prowess.

The next month, EP confirmed it was "underway with the Wordpress widget" programming, and that based upon the quote proscribed in the schedule of the September 21, 2011 agreement that KMG would not be charged for certain portions of its development.  D.E. 1,

Ex. J.  Further clarifying this point, EP addressed how any hours required over the 120 budgeted

for the project would be absorbed by EP.  D.E. 1, Ex. K.  Both November 2011 communications

confirmed the licensing nature of the relationship.  This was all further confirmed in a related

communication between KMG and one of EP's programmers Alex Inman who commented that:

> [Norbert from KMG] mentioned that [KMG] are interested in the Word Press
> Module "source code". Tim [Green] will review the requests and help provide
> [KMP] more information on the documentation on the WP module. Of course this
> module was sponsored by Eyepartner and in large part paid for by Eyepartner.
> ***This was not a "work for hire" deliverable.*** Tim [Green and KMP] had email
> correspondence regarding the same on November 10, 2011.

D.E. 1, Ex. L (emphasis added).  At no time did Defendants seek a separate work-for-hire

agreement. Green Decl., ¶ 11.

### C.  Defendants' May 2012 Demands to Obtain Control over EP's Source Code

EP transitioned KMG to Version 3.2 of the TikiLIVE Platform proximate May 2012 –

which is protected by the TikiLIVE v3.2 Registration. *See* Green Decl., ¶ 5.  Likewise, EP

introduced WordPress v2.2 by June 2012 which was incorporated into the TikiLIVE Platform.

*See id*.  On May 14, 2012, KMG contacted EP to demand gaining access to the unencrypted

versions of EP's databases maintained on EP's hurricane server that housed the TikiLIVE

platform (including the WordPress module) – despite the clear terms found in the September 21,

2011 agreement specifying how "[t]he source code of licensed products shall not be made

available to [KMG] under this Agreement."   D.E. 1, Ex. F.

Korman again demanded "developmental control" over the WordPress source code via a

May 23, 2012 email.  D.E. 1, Ex. O.  This email included the alarming suggestion that it was

KMG's "understanding [ ] that [KMG] would own the WordPress module."   *Id.*  EP responded

to Korman's demands the following day stating that EP's WordPress module was "proprietary,"

and that its programming took some 200 hours to create (which was far less than then 120 hours

agreed upon in the Schedule attached to the September 21, 2011 agreement).  D.E. 1, Ex. P.  In suggesting that these overages were borne by EP due to the licensing nature of the WordPress module, EP further noted that KMG was being licensed the second version of the WordPress module (Version 2.0) – which had taken 300 development hours:

> Now you may ask us when can you receive the V2.0 upgrade and how much should you be expected to pay for this upgrade. The answer is you pay nothing at all it is free. If you like the upgrade, you receive all of the benefits of our works and advancements since we delivered WP V1.0.

*Id.* Such exchange denoted the continued licensing nature of the TikiLIVE platform, as well as the add-on WordPress module.  By May 30, 2012, KMG confirmed the upgrade to TikiLIVE v3.2 and then later WordPress v2.2 based upon its prior discussions in the May 18, 2012 timeframe.  Green Decl., ¶ 10.  At no time subsequent to May 30, 2012 did KMG seek a separate and explicit written agreement for purposes of seeking any form of ownership of WordPress v2.2 or in TikiLIVE v3.2. Green Decl., ¶ 11.

### D.  EP's Confidentiality Safeguards and KMG's Circumvention Efforts

EP takes numerous precautions and safeguards regarding confidentiality of the TikiLIVE platform.  These steps include encryption through the Ion Cube protocol (which protects PHP type source code) to prevent the TikiLIVE platform from being altered by licensees.  Green Decl., ¶ 12.  Likewise, EP operates its hurricane server through a CentOS Linux system having strict permission settings such that licensees (including KMG) cannot alter or delete files or directories (but rather only access encrypted forms of the TikiLIVE platform).  *Id.* at ¶ 13.  Such reasonable safeguards as to confidentiality through these server protocols functions such that KMG (and Korman) did not have full access rights when accessing EP's hurricane server to access the TikiLIVE platform, but instead only limited "SSH access" which allowed the limited right to log-in, make updates on select files, and edit files and documents through Cpanel and

FTP credentials *Id.* at ¶ 14.  Moreover, under these privacy settings, only EP employees had full access rights to these files, while KMG authorized personnel had limited access rights through these Linux permissions to the files, which were housed on a directory called **home/glovue/public_html_tl/** ("TL Directory") which contained the encrypted TikiLIVE v3.2 source code (which incorporates the WordPress v2.2 source code).  *Id.* at ¶ 15.

During routine server maintenance in approximately late February 2012, EP discovered that KMG created a new directory on the hurricane server named **home/glovue/public_html/wp-content/tiki-admin** ("Tiki-Admin Directory"). *Id.* at ¶ 16.  This unauthorized TikiLIVE directory housed approximately 485 plain text (*i.e.*, unencrypted) PHP files that bore strikingly similar names to encrypted files maintained by EP in the TL directory. *Id.* at ¶ 17; *see also* Johnson Decl., ¶ 21.[2]  Preliminary review of these plain text PHP files confirmed they housed 48 pages of TikiLIVE source code, and that EP's headers and copyright notice had been meticulously removed.  Green Decl., ¶ 17; *see also* Johnson Decl., ¶ 21.  A side-by-side comparison reveals this obvious copying by Defendants:



---

[2] Attached in further support for Plaintiff's motion for preliminary injunction is the declaration of Victor Johnson, attached as **Exhibit F**, an expert in digital forensics (hereinafter "Johnson Decl., ____").

Johnson Decl., ¶ 22.  In fact, further investigation conducted by EP revealed that between October 2012 and March 2013, Defendants engaged in some 5,000 transfers through FTP protocol through from six rouge IP addresses originating from Western states.  Johnson Decl., ¶ 20.  Moreover, during that same time frame, Defendants had accessed and transferred 119 EP files that formed the TikiLIVE v 3.2 software.  *Id.*.  By accident or by error, Defendants left a trail in performing these acts of cyber-piracy in that they forgot to delete a login program in one of the directories – called "logon(orig).php."  *Id.* at  ¶ 23.  Review of this file revealed the following calling card:

```
/**
 *
 * @ This file is created by Decodeby.US
 * @ deZender Public (PHP5 Decompiler)
 *
 * @   Version           :   1.0.0.0
 * @   Author            :   Ps2Gamer & Cyko
 * @   Release on        :   30.05.2011
 * @   Official site     :   http://decodeby.us
 *
 */
```

Further investigation by EP revealed this login program is a PHP decompiler programmed called "deZender" offered at Decodeby.us which was used to improperly seek access to EPI's hurricane server, exceed the authority given by EP, lift hundreds of encrypted files, and then remotely de-encrypt EP's proprietary and confidential files.  *Id.* at  ¶ 27.  Moreover, it appears that the deZender program was authored by a notorious hacker named "Ps2Gamer & Cyko" – who has publicly touted the ability to de-encrypt Ion Cube encrypted PHP files. *Id.* at  ¶ 24, 25.

Upon discovery of Defendants decryption of EP's proprietary copyrighted source code, EP took swift action in temporarily shutting down Defendants access rights to the hurricane

server (and likewise the TikiLIVE platform) as well as serving a demand letter on March 1, 2013 regarding these overt acts of decompiling and un-encrypting EP's confidentiality measures regarding its code (in addition to Defendants' acts of copying).   *See* Green Decl., ¶ 19; D.E. 1, Ex. Q.  Defendants' response came quickly in that Korman appeared to concede these acts, pointed fingers, and tried to shift the issue.   D.E. 1, Ex. R.  Later that same day, Korman admitted to the de-encryption and that he was having Mitchell work on "getting the details on what has been done . . ."  D.E. 1, Ex. S.  The next day Korman communicated a need to conduct "damage control," confirmed that KMG had access to de-encrypted copies of  TikiLIVE v3.2 as well as WordPress v2.2, but yet mocked Mr. Green suggesting it would be easy for hackers to de-encrypt EP's confidentiality safeguards:

> In reality Tim, [i]f you are so concerned that an international firm could easily decode and reverse engineer your program then that should be your concern.

*See id*. at Ex. T.

Defendants continue to posses, employ, offer for sale and license de-encrypted PHP versions of TikiLIVE (as well as WordPress v 2.2) for purposes of offering services that complete directly with EP.   From materials viewed proximate and subsequently to the Complaint, Defendants' GloVue Website and related marketing materials tout systems and modules that appear to be running off of EP's copyrighted source codes. *See* Green Decl., ¶ 22-24.  Indeed, Defendant's neglected to remove EP's "TikiLIVE.com" logo in advertising their services. *See* Green Decl., ¶ 24.

With Defendants refusal to stop these malicious acts, and the continued irreparable harm thereby resulting, EP is necessitated to seek preliminary injunction to guard against Defendants carefully orchestrated and clandestine plot to obtain illicit copies of EP's source code and then

use that source code via the GloVue website to wage unfair acts based upon this clear course of copyright infringement and misappropriation of trade secrets.

## II.      ARGUMENT IN SUPPORT OF PRELIMINARY INJUNCTION

As in any preliminary injunction matter, EP bears the burden as the moving party to establish four factors: (1) substantial likelihood of success on the merits of its underlying claims sounding in copyright infringement and trade secret theft, (2) that EP will suffer irreparable harm absence an injunction regarding Defendants access and usage of EP's computer source code, (3) that this harm suffered by EP in the absence of an injunction exceeds the harm to be suffered by Defendants if preliminarily enjoined, and (4) such injunction would not disserve the public interest. *Live the Life Ministries v. Pairs Found., Inc.*, 2011 U.S. dist. LEXIS 148499 (N.D. Fla., Sept. 27, 2011) at \*21 (quoting *Grizzle v. Kemp*, 634 F.3d 1314, 1320 (11th Cir. 2011).   As shown by the following, EP easily meets its burden as to all four factors:

### A.      EP's Substantial Likelihood of Success on the Merits

#### i.      EP is likely to succeed on the merits of its copyright claim

The Copyright Act specifically contemplates that a court may grant injunction "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." *17 U.S.C. § 502(a)*.  To obtain such injunction, a copyright holder must make out a *prima facie* case of copyright infringement by establishing: "(1) ownership of a valid copyright, and (2) copying of constitutional elements of the work that are original." *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

Regarding the first prong, "a certificate of registration made before or within five years after the first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." *Id.* (quoting *17 U.S.C. § 410(c) (1977)).

Here, EP filed for, and obtained, copyright registration for TikiLIVE v.3.2 in March 2013, less than a year from its May 2012 software launch (and offering to Defendants).  *See* D.E., Ex. A. This quick action easily meets first prong to establish valid copyright in TikiLive v3.2.[3] *Compare e.g. Gaffigan v. Doe*, 689 F. Supp. 2d 1332, 1340-41 (S.D. Fla. 2009) (finding that submission of copyright registrations covering works at issue sufficiently demonstrated ownership); *Tracfone Wireless, Inc. v. Technopark Co., Ltd.*, 281 F.R.D. 683, 688  (S.D. Fla. 2012) ("A certificate of copyright registrations creates a rebuttable presumption that the copyright is valid.").  Moreover, such ownership in valid copyright is further confirmed based upon the clear language in EP's September 21, 2011 Agreement that it owns copyright in the code unless there is a separate explicit written agreement entered – which never happened, nor which Defendants ever sought.

The second prong in establishing a *prima facie* case of infringement is met by showing either direct evidence of copying or "inferred from proof of access to the copyrighted work and 'probative similarity.'" *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532 (11th Cir. 1996) (quoting *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994)). Despite the rarity of establishing such direct evidence, Defendants were caught red-handed in their clandestine efforts to circumvent EP's encryption and then place de-encrypted copies of the TikiLIVE v3.2 source code back onto the hurricane server.  *See* Green Decl. at ¶ 21; *See also* **Exhibit E** ("To my best knowledge no outside 'decrypting' service was done for anything - just

---

[3] Defendants have admitted that portions of the TikiLIVE platform constituting the TikiLIVE v3.2 source code is owned by EP. *See* **Exhibit E** ("But from my standpoint and from what I have been told by my staff GloVue has never represented that the base platform was our code."). While Defendants may undoubtedly allege that the WordPress v2.2 source code was a work for hire and thus owned by the Defendants, the fact remains that Defendants unlawfully decrypted and copied the entirety of EP's copyrighted work. Further, any notion that the WordPress v2.2 source code was a work for hire is baseless. The Agreement explicitly provided that "[u]nless explicitly 'work-for-hire' agreements [are] executed,  any and all source code of licensed products owned by EP shall remain the intellectual property of EP." D.E. 1, Ex. F. No explicit work for hire agreement was entered into between the parties. Further, proximate November 2011, EP clearly informed Defendants that the Wordpress module "was not a 'work for hire' deliverable." D.E. 1, Ex. L.

our own staff and perhaps one of our close partners here in Vegas."); D.E. 1, Ex. T ("In our discussion Tim you indicated that we somehow have your code reverse engineered and decoded through a third party (you mentioned road runner – which is Nic) . . .").  Put simply, Defendants carefully orchestrated actions to jail-break EP's encrypted code, use a hacking software to de-encrypt it off-site, and then return of the code to the hurricane server not only meets the second prong as "direct evidence," but constitutes compelling evidence to establish infringement.

What is more, Defendants' affront on EP's hurricane sever to deencrypt EP's copyrighted software violated EP's exclusive rights, including but not limited to, the right "to reproduce the copyrighted work." *See 17 U.S.C. § 106(1)*.  Additionally, after Defendants decrypted the EP's copyrighted source code, they uploaded portions back onto EP's hurricane server and modified it for their own personal use. *See* Green Decl. at ¶ 20.  These acts violated EP's exclusive rights, including but not limited to, the right "to prepare derivative works based upon the copyrighted work." *17 U.S.C. § 106(2)*.  As the foregoing chronology illustrates, Defendants' carefully orchestrated caper reveals a concerted effort to copy EP's copyright source code as part and parcel of their clandestine plot.

Moreover, even if the above admissions by Defendants of direct evidence were not sufficient, there is little to doubt that the circumstantial evidence (of which there is much) further confirms copying – and accordingly establishes infringement.  Defendants cannot escape the reality that the underlying September 2011 hosting agreement allows access – although restricted and limited under the CentOS Linux based system – use of an encrypted version of the TikiLIVE v3.2 source code (again protected by the TikiLIVE v3.2 Registration) (*see* D.E. 1, Ex. A), which Defendants decrypted creating unauthorized reproductions and derivative works which clearly exceeds the scope of the limited grant afforded by the September 21, 2011 Agreement.  Moreover, the related hosting terms found in that agreement provided Defendants limited access

to EP's hurricane server which contained a number of encrypted PHP files that comprised the TikiLIVE platform. *See* Green Decl. at ¶ 15.  Only EP and Defendants had authority to access these files – with significant safeguards in place (including limited SHH access rights). *See* Green Decl. at ¶ 14, 15.

Among the files placed on the hurricane server by EP under the September 21, 2011 Agreement was a directory denotes as **/home/glovue/public_html_tl/** ("TL Directory"), which contained a number of encrypted files comprising the TikiLIVE platform. *See* Green Decl. at ¶ 15; Johnson Decl. at ¶ 17.  Defendant was to use the encrypted files to run its own business, again under mere licensed rights.  Instead, routine server maintenance (and a later investigation) revealed that Defendants created their own directory named **home/glovue/public_html/wp-content/tiki-admin** ("Tiki-Admin Directory") for the purposes of uploading documents to the server. *See* Green Decl. at ¶ 16; Johnson Decl. at ¶ 19. Moreover, the Tiki-Admin Directory contained approximately 485 plain text PHP files that bore similar names to those in the TL directory. *See* Green Decl. at ¶ 17; Johnson Decl. at ¶ 17.  Such fodder can hardly be said to be coincidence and instead establishes circumstantial evidence of copying beyond the pale.

Likewise located within the Tiki-Admin Directory was a file named "logon(orig).php" as previously explained above. *See* Johnson Decl. at ¶ 23. "DeZender" appears to be a hacker program for decrypting PHP files that were encrypted with Ion Cube encryption. *See* Johnson Decl. at ¶ 24.  In other words, Defendants had obtained copies of EP's copyright protected encrypted source code through the TL Directory, decrypted the files using "deZender," then uploaded unencrypted portions of the source code to the Tiki-Admin Directory for purposes of modifying the source code for Defendants use.  As such, Defendants not only enjoyed access to EP's hurricane server, but likewise had access to both encrypted and unencrypted version of EP's copyrighted work.

While only a "probative similarity" is necessary under the second prong, the Defendants' decryption process created an almost verbatim copy[4] of the Plaintiff's source code. *Compare Tracfone Wireless, Inc. v. Technopark Co., Ltd.*, 281 F.R.D. 683, 688  (S.D. Fla. 2012) ("In the context of computer software…when the defendant has engaged in literal or verbatim copying of all of the protected source code, there is sufficient evidence to authorize a finding of infringement.").  Moreover, Defendants uploaded approximately 48 pages of EP's source code to the hurricane server to modify the code and further create infringing derivative works.  Thus, there is more than sufficient evidence to allow the Court to infer that Defendants performed a wholesale copying of EP's copyrightable source code which maintains a presumption of validity due to the certificate of registration.

  ii. <u>EP is likely to succeed on the merits of its circumvention of copyright protection systems claim.</u>

In addition to traditional copyright infringement, Section 1203 of the Digital Millennium Copyright Act ("DMCA") explicitly provides for a court's grant of injunction to "prevent or restrain a violation" of Section 1201 or 1202. *See 17 U.S.C. § 1203*. § 1201(a)(1) of the DMCA states that "no person shall circumvent a technological measure that effectively controls access to a work protected under the title." *Auto. Inspection Servs., Inc. v. Flint Auto Auction, Inc.*, 2006 U.S. Dist. LEXIS 87366 (E.D. Mich., Dec. 4, 2006) at *22 (quoting *17 U.S.C. § 1201(a)(1)*). *§ 1201(a)* of the DMCA defines such a technological measure to mean that "the measure, in the ordinary course of its operation, requires that the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id.* (quoting *17 U.S.C § 1201(a)(3)*(B)).  As explained above, to prevent unauthorized access to the EP's

---

[4] The headers and copyright notification information contained in the source code had been removed – likely as a result of the decryption process. *See* Green Decl. at ¶ 18. Further, there were additional modifications to the source code over time after it had been placed back on the server in plain text form. *See* Green Decl. at ¶ 20.

copyrighted source code, EP maintained its source code on web servers that operated on a Linux based system named CentOS. *See* Green Decl. at ¶ 13; Johnson Decl. at ¶ 10.  Linux is a permissions-based operating system, requiring specific rights to access, alter, or delete files and directories. *See* Green Decl. at ¶ 13; Johnson Decl. at ¶ 10.  Further, the TikiLIVE v3.2 source code was encrypted using Ion Cube software – standard and acceptable for protecting software - that is used to protect software written using PHP programming language from being viewed or altered by unauthorized persons. *See* Green Decl. at ¶ 12; Johnson Decl. at ¶ 9.

As such, EP's measures fall well within the above definition of technological measures that control access because the encryption prevented an ordinary user from accessing the source code without EP's permission.  Although Defendants were later able to access the source code with the assistance of the "deZender" code does not make EP's encryption any less of a proper technical measure. *See Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 932 (N.D. Cal. 2009) ("The DMCA is predicated on 'the authority of the copyright owner' not 'whether or not [the technological measure] is a strong means of protection.'") (quoting *Universal City Studios, Inc. v. Reimerdes,* 111 F. Supp.2d 294, 318 (S.D.N.Y. 2000)).  All that is required under the statute is that the technological measure control access of the ordinary consumer to prevent the easy creation of widely available and usable copyrighted works. *See id*.

Further, under the DMCA, "[c]ircumventing a technological measure means '. . . to decrypt an encrypted work . . . without authority of the copyright owner.'" *Auto. Inspection Servs.*, 2006 U.S. Dist. LEXIS 87366 at *22 (quoting *17 U.S.C. § 1201(a)(3)(A)*).  As previously explained, an investigation of the EP hurricane server revealed that Defendants clearly circumvented EP's aforementioned technological measures through use of the "deZender" code.

EP never gave permission to Defendants to decrypt its code.  On the contrary, the September 21, 2011 Agreement clearly states that Defendants are prohibited from translating or reverse engineering the source code. *See* D.E. 1, Ex. F.

> iii.  <u>EP is likely to succeed on the merits of its trade secret misappropriation claim.</u>

To be successful on a claim for trade secret misappropriation under Florida law, a trade secret holder must prove: "(1) the existence of a trade secret and (2) that the secret was a misappropriated." *Vraiment Hospitality, LLC v. Binowski*, 2012 U.S. Dist. LEXIS 59331 (M.D. Fla., Mar. 19, 2012) at *38. The *Florida Uniform Trade Secrets Act* ("FUTSA") defines a trade secret as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) Derive(s) independent economic value, actual, or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Greenberg v. Miami Children's Hospital Research Institute, Inc.*, 264 F. Supp. 2d 1064, 1076 (S.D. Fla. 2003) (quoting *Fla. Stat. § 688.002(4)*).  It cannot be seriously disputed that EP's TikiLive v3.2 and WordPress v2.2 source codes do not fall under this broad definition.  Courts have long recognized that "[c]omputer programs are trade secrets." *WIT Walchi Innovation Techs., Gmbh v. Westrick*, 2012 U.S. Dist. LEXIS 7933 (S.D. Fla., Jan. 24, 2012) at *9.  Indeed, the licensing agreement between EP and Defendants for the TikiLive platform and optional module indicates that the "Software, Documentation and Program Concepts, any archival or back-up copies thereof, and any information which has been identified as proprietary by the disclosing party" constitutes "proprietary information."  *See* D.E. 1, Ex. F. Such "proprietary information" covers the TikiLive v3.2 and WordPress v2.2 source codes (which is incorporated into the TikiLIVE v3.2 Registration).

EP derives actual independent economic value from its proprietary source codes, from not being generally known to, and not being readily ascertainable by, proper means by other persons who can obtain economic value from its disclosure or use.  TikiLive v3.2 and WordPress v2.2 are part of the TikiLive platform – EP's flagship broadcasting service. *See* Green Decl. at ¶ 1.  A significant part of EP's business involves licensing out its TikiLive platform as well as creating and licensing modules to parties like Defendants. *See* Green Decl. at ¶ 1.  In other words, the viability of EP is directly tied to EP's source code not being generally known to the public allowing EP to license it out.

While the statute only requires a party to take reasonable steps to ensure the secrecy of the trade secret, EP goes above and beyond.  EP encrypts TikiLive v3.2 through the Ion Cube protocol to prevent its code from being accessed or altered by licenses. *See* Green Decl. at ¶ 12.  EP does not provide unencrypted versions of its source code to its licensees. *See* Green Decl. at ¶ 7; *See also See* D.E. 1, Ex. F. ("The source code of licensed products shall not be made available to the Client under this Agreement.").  Nor has EP ever provided unencrypted source code to Defendants. *See* Green Decl. at ¶ 7.  Thus, the only individuals or entities allowed access to unencrypted versions of the source code are EP and its employees.  EP requires these employees to sign strict non-disclosure agreements regarding the source codes of its software. *See id*.

Moreover, the licensing agreement between EP and Defendants requires that each party shall at a minimum exercise reasonable care to keep each other's confidential and trade secret information confidential and take precautions to prevent unauthorized disclosure. *See* D.E. 1, Ex. F.  Such obligations extend beyond the term of the Agreement. *See id*.  The Agreement further requires that Defendants are not allowed to "translate, reverse engineer, decompile, or disassemble" EP's source code in order to ensure secrecy.  *See id*.

**B.  EP Will Suffer Irreparable Harm in the Absence of an Injunction**

The Eleventh Circuit has found that irreparable harm is presumed upon a showing of copyright infringement in the absence of a fair use defense. *C.B. Fleet Co., Inc. v. Unico Holdings, Inc.*, 510 F. Supp. 2d 1078, 1083 (S.D. Fla. 2007).  Irreparable harm has likewise been presumed upon a showing of circumvention of copyright protection systems. *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 953 (N.D. Cal. 2009).  Finally, a presumption of harm also exists upon showing a likelihood of success on the merits of a misappropriation of trade secrets claim creates a presumption of irreparable harm. *WIT Walchi Innovation Techs., Gmbh v. Westrick*, 2012 U.S. Dist. LEXIS 7933 (S.D. Fla., Jan. 24, 2012) at *10.  Even discounting such presumptions, EP has sufficiently shown that it will suffer irreparable harm in the absence of a preliminary injunction.  As previously stated, a significant portion of EP's business is licensing its TikiLIVE broadcasting platform and creating related modules. *See* Green Decl. at ¶ 1.  With EP's deencrypted code in the hands of a former licensee and potential competitor, EP not only loses the licensing revenue from Defendants but EP's code risks public disclosure as long as it remains in the hands of Defendants in its unencrypted form.  Such disclosure would be disastrous to EP's entire business as it would destroy any market interest in the TikiLIVE products. *Compare C.B. Fleet*, 510 F. Supp. 2d at 1083 (stating that loss of market share because plaintiff loss one of its retailers due to defendant offering the infringing product at a discounted rate was more than sufficient to establish irreparable harm).

### C.  The Balance of Harms Weights in Favor of Granting a Preliminary Injunction

Defendants will suffer minimal hardship in the face of a preliminary injunction compared to the substantial hardship EP is suffering in the absence of such injunction. As laid out above, in the absence of an injunction, EP will suffer an irreparable injury in the form of a loss of profits, good will, and reputation through the unlicensed use, loss of control, and potential disclosure of EP's proprietary flagship software offerings.  On the other hand, the only injury Defendants

would sustain is that they would not be allowed to use the infringing source code.  While this may have drastic effects on Defendants' business, such is not a legitimate harm as Defendants have no rights to maintain or use EP's software.  It is well recognized that "a company cannot build a business on infringements and then argue that enforcing the law will cripple that business." *CBS Inc. v. Primetime 24 J.V.*, 9 F. Supp. 2d 1333, 1345 (S.D. Fla. 1998); *See also Adobe Sys, Inc. v. Brenegen*, 928 F. Supp. 616, 618 (E.D.N.C. 1996) ("Because defendant is engaged in infringement, the only hardship he will suffer as a result of an injunction is court-ordered compliance with the copyright laws.  Thus, defendant will lose only profits derived from illegal distribution of plaintiffs' software."); *Chanel, Inc. v. Chanel255.org*, 2012 U.S. Dist. LEXIS 73894 (S.D. Fla., May 29, 2012) at *15 ("It does not appear that Defendants will suffer any legitimate hardship if a preliminary injuries issued because they have no legal right to use the Chanel Marks on their websites or to sell counterfeit Chanel products.").  Thus, the balance of harms greatly weighs in favor of a preliminary injunction.

### D.  Granting a Preliminary Injunction Serves the Public Interest

Courts have likewise found that when the plaintiff has shown a likelihood of success on the merits of a copyright infringement claim, a preliminary injunction serves the public interest. The rationale is that "[t]he public interest can only be served by upholding copyright protection and preventing the misappropriation of protected works." *C.B. Fleet Co., Inc. v. Unico Holdings, Inc.*, 510 F. Supp. 2d 1078, 1084 (S.D. Fla. 2007); *See also Stoneworks, Inc. v. Empire Marble & Granite, Inc.*, 1998 U.S. Dist. LEXIS 21762 (S.D. Fla., Nov. 19, 1998) at *17 (stating that the public interest is served by "upholding copyright protection and preventing misappropriation of the skills, creative energies and resources which are invested in the protected work.").

Preliminary injunction will prevent Defendant's from continuing to misappropriate and benefit from EP's time and creative energy that it invested into its copyrighted software and trade secrets. *See e.g. id.*; *Adobe Sys, Inc. v. Brenegen*, 928 F. Supp. 616, 618 (E.D.N.C. 1996) ("[A]n injunction will serve the public interest by protecting the 'special reward' of copyright which motivates 'the creative activity of authors[,] inventors,' and programmers.") (quoting *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)).

## III.   CONCLUSION

For the foregoing, reasons, Plaintiff EyePartner Inc. respectfully moves for a preliminary injunction against Defendants from maintaining, using, distributing, marketing, running, benefiting from, promoting, selling, offering for sale and licensing EP's copyrighted TikiLIVE software platform, and engaging in acts of unfair competition based upon Defendants rogue efforts to clandestinely de-encrypt EP's confidential intellectual property, and then continued unlicensed use in direct competition.

Respectfully submitted this 30th day of April, 2013.

/s/ Robert H. Thornburg
Robert H. Thornburg, Esq.
Florida Bar No. 630829
E-Mail: rthornburg@addmg.com
Matthew N. Horowitz, Esq.
Florida Bar No. 98564
E-Mail: mhorowitz@addmg.com
ALLEN, DYER, DOPPELT, MILBRATH
  & GILCHRIST, P.A.
1221 Brickell Ave., Suite 2400
Miami, FL  33131
Telephone:     305-374-8303
Facsimile:      305-374-8306

Counsel  for Plaintiff EyePartner Inc.

## Certificate of Service

I hereby certify that on April 30, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:     /s/ Robert H. Thornburg
Robert H. Thornburg, Esq.

## Service List
CASE No.: 4:13-cv-10072-JLK

KOR MEDIA GROUP LLC
d/b/a GLOVUE
c/o Robert Korman, Registered Agent
3150 West Wigwam Avenue
Las Vegas, NV  89139
Corporate Defendant
Method of Service: FedEx

ROBERT KORMAN
3150 West Wigwam Avenue
Las Vegas, NV  89139
Individual Defendant
Method of Service: FedEx